Filed 6/9/16  P. v. Isaac CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C074387 |
| v. | (Super. Ct. No. 12F03828) |
| SYLVESTER ISAAC, | |
| Defendant and Appellant. | |

A jury found defendant Sylvester Isaac guilty of raping his 14-year-old daughter, L., on two separate occasions.  In addition to two counts of forcible rape (Pen. Code, § 261, subd. (a)(2)),[1] the jury convicted defendant of two counts of incest (§ 285), and two counts of committing a lewd or lascivious act on a child of 14 years (§ 288, subd. (c)(1)).  The jury also found defendant personally inflicted great bodily injury in the

---

[1]    Undesignated statutory references are to the Penal Code.

1

commission of three of these offenses (§ 12022.7, subd. (a)), i.e., on one of the occasions he raped his daughter. Following a bifurcated trial on defendant's prior convictions, the jury found defendant had served seven prior prison terms (§ 667.5, subd. (b)), one of which was imposed for a serious felony conviction within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12). The trial court sentenced defendant to serve an aggregate determinate term of 42 years in state prison and imposed other orders.

On appeal, defendant contends: (1) his forcible rape convictions must be reversed because L.'s testimony regarding the element of force was "incredible" and "inherently improbable"; (2) the trial court abused its discretion and violated his federal constitutional rights by preventing his trial counsel from cross-examining L. about an admitted lie she told the prosecutor to get out of school; and (3) the prosecutor committed prejudicial misconduct and further violated his constitutional rights by, among other things, arguing to the jury "defense counsel must produce 'credible' consent evidence to refute [the] forcible rape charges," which defendant argues constituted improper burden shifting and indirect comment on his failure to testify in violation of *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106] (*Griffin*).

We affirm. Substantial evidence supports defendant's forcible rape convictions. Assuming the trial court abused its discretion by preventing defense counsel from cross-examining L. about her lie to the prosecutor, this assumed error was harmless under any standard of prejudice. Finally, defendant's assertions of prosecutorial misconduct lack merit. Viewed in context, the prosecutor's argument to the jury neither shifted the burden of proof to defendant, nor did it naturally and necessarily highlight defendant's failure to testify in violation of *Griffin*.

2

FACTS

At the start of her 8th-grade year, L. moved in with defendant, having previously lived with her mother, K.G., and older sister, A. K.G. and defendant had two children together, L. and A. Defendant fathered several additional children with various other women, including T.B., whose role becomes significant later in this opinion. K.G. considered defendant to be her "best friend." She also considered him, his other children, and two of the other mothers to be part of her family. Prior to L. moving in, defendant spent time with her and A. on a daily basis, either coming to K.G.'s house or having K.G. and the children over to his house.

A few months after L. moved in with defendant, he came into her bedroom during the night and got into bed with her. He then removed her pajama bottoms and had sex with her until he ejaculated. Initially confused about the situation, L. began to cry when defendant penetrated her vagina with his penis. While L. did not testify that she told her father to stop, or that she tried to get away, she did testify defendant "held [her] arms down" while he had sex with her, which she previously told an interviewer at the Special Assault Forensic Evaluation (SAFE) Center made her feel she could not get away. L. was 14 years old.

On another occasion, around the same time, defendant picked L. up from K.G.'s house after school in his van. T.B. and a small child defendant fathered with her were also in the van. After dropping T.B. and the child off someplace, defendant drove L. to a secluded location, parked, and told L. to get in the back of the van. When L. refused, defendant "pushed [her] in the backseat." He then took off her pants and had sex with her while she cried. This time, however, L. tried to get away from defendant, but was unable to do so. As she explained to the SAFE interviewer: "I couldn't - he - it was like - it was like the van is small and the two chairs on the side of me, they are closed in and

3

he's big and I'm small and I can't fit, get out, no way." She continued: "I was - I was liftin' up, like tryin' to get up and the whole time it was like his weight was on me." At trial, L. confirmed she tried to get out from under defendant, but could not do so because "his weight was on [her]."

L. moved back in with K.G. a few weeks after the incident in the van. She told no one about what defendant had done to her until about five months later, when she discovered she was pregnant. At University of California at Davis Medical Center, L. told hospital staff she had sex with "a boy her age from her school." When staff left the room, she confided in her mother that "it was her dad." She provided no details at that point in time. K.G. testified: "I just held her, and we both cried." K.G. later confronted defendant, who neither admitted nor denied having sex with his daughter.

After K.G. and L. returned home from the hospital, someone from Child Protective Services (CPS) came to their house and questioned L. about the pregnancy. L. told this person she had sex with "a boy with dreadlocks." A different person from CPS came to their house about a week and a half later. L. told this person the same story. About an hour after the second social worker left, K.G. received a call from CPS requesting the boy's contact information. K.G. said she would call them back, hung up the phone, and spoke to L. about the situation. K.G. then called CPS and revealed it was defendant who had sex with their daughter. The social worker returned a short time later with two police officers. One of the officers spoke to L. privately in the backyard. She described the incident that occurred in the bedroom, and cried as she did so, but did not report the incident in the van. A detective then arranged for a SAFE interview, which took place two weeks later. It was during this interview L. revealed the details of both incidents.

4

L.'s child was born about two months later.  DNA testing confirmed defendant was the father.  Defendant was arrested a short time after the DNA report came in, about six months after the child's birth.

The following month, L. wrote a statement that was given to the district attorney.  The statement read:  "I am writing my statement in reg[ard] to my dad Sylvester Isaac.  He did not force me to have sex with him[.]  I only said those things out of fear[.]  I was scared of [l]osing my family.  I thought they would turn against me[.]  I thought that we would be taken from my mom if I didn't say those things.  I choose not to go into details."  The statement was signed by L., as well as by K.G. and two other witnesses.

As K.G. explained the statement's genesis, she had a conversation with T.B., who apparently had done some legal research at McGeorge School of Law, and who questioned whether L. knew what "rape by force" meant.  T.B. asked K.G. to have a conversation with L. to determine whether she understood the nature of the crime she accused defendant of committing.  T.B. also suggested L. could write "some kind of statement" if she did not understand the nature of forcible rape.  L. was present when T.B. and K.G. had this conversation, but just "sat back and listened."  L. testified she heard T.B. say if she wrote a statement saying defendant did not force her to have sex with him, it would be "better" and "easier" on her.  The next day, K.G. spoke to L. privately about T.B.'s suggestion, asking whether she knew what force meant.  L. said she did not.  Apparently based on her prior conversation with T.B., K.G. asked L.: "[D]id he put a gun to your head?  Did he put a knife to your throat?  Did he [make] any threats?"  L. answered "no," which meant to K.G. that defendant had not raped her.  L. agreed to write a statement.

The following day, T.B. picked K.G. and L. up and drove them to a postal annex with notary services, where L. wrote the above-quoted statement that K.G. and two

5

employees also signed. With respect to whether K.G. provided L. with any input as to the content of the statement, she testified: "I just told her -- I told her what [T.B.] had said when she went to McGeorge School of Law, and it was up to her, and did she know what rape really meant and all that other stuff. And she said yeah, and she wrote it." K.G. also testified that during one of her conversations with L. about writing the statement, L. said, "[D]ad didn't force me." T.B. testified she also asked L. whether she knew what force meant. According to T.B., L. "didn't . . . really say too much," except: "'It didn't happen that way.'" L. testified she wrote the statement because she "was not trying to have people turn against [her]."

We finally note defendant spent several months incarcerated on an unrelated matter, beginning a few weeks after L. moved back in with K.G. and ending just after L.'s child was born. L. wrote three e-mails to defendant shortly after he was sent to prison. K.G. also brought L. to visit defendant in prison on three occasions, once after she was aware of the pregnancy and that defendant was the father. During the roughly six months between defendant's release in that matter and his arrest in this one, defendant often visited K.G.'s house and gave K.G., L., and A. rides to various places, including the new baby's doctor appointments. According to K.G., L. did not appear to be afraid of defendant, although she sometimes "would act out and flip out." K.G. also testified defendant repeatedly denied forcing L. to have sex with him.

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant contends his forcible rape convictions must be reversed because L.'s testimony regarding the element of force was "incredible" and "inherently improbable." We disagree.

6

"'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560].) "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*); see also *People v. Scott* (1978) 21 Cal.3d 284, 296 [rule "applicable to sex cases"].)

The crime of forcible rape requires (1) "an act of sexual intercourse," (2) "with a person not the spouse of the perpetrator," (3) "accomplished against [that] person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a).) "'[I]n order to establish force [under this provision], the prosecution need only show the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the [victim].' [Citation.]" (*People v. Griffin* (2004) 33 Cal.4th 1015, 1023-1024.) This is because "'[t]he fundamental wrong at which the law of rape is aimed is not the application of physical force that causes physical harm. Rather, the law of rape primarily guards the integrity of a [person's] will and the privacy of her [or his] sexuality from an act of intercourse undertaken without [the person's] consent. . . .' [Citation.]" (*Id.* at p. 1025.) Accordingly, "in a forcible rape prosecution the jury determines whether the

use of force served to overcome the will of the victim to thwart or resist the attack, *not* whether the use of such force physically facilitated sexual penetration or prevented the victim from physically resisting [the] attacker." (*Id*. at p. 1027.)

In *People v. Griffin*, *supra*, 33 Cal.4th 1015, after setting forth the foregoing legal principles, our Supreme Court held the evidence adduced in that case was sufficient to support the defendant's forcible rape conviction. There, the defendant was convicted of one count of forcible rape and several counts of child molestation committed against his girlfriend's daughter. (*Id*. at pp. 1018-1019.) The rape conviction was supported by the victim's testimony that he "pinned [her] arms to the floor as he penetrated her vagina with his penis." (*Id*. at p. 1029.) The victim also "unequivocally testified she did not consent to the act of intercourse and that it was accomplished against her will." (*Ibid*.) The defendant argued the evidence did not establish the intercourse was accomplished by force because the victim did not object until he had penetrated her vagina, at which point she was able to stop him by getting up. Rejecting this argument, the court explained that while the defendant had engaged in other criminal sexual conduct with the victim in the past, "[she] had never previously encountered [his] attempt to have intercourse with her, as this was his first attempt. The jury could reasonably infer that by pinning her arms to the floor, defendant was able to achieve penetration on the occasion in question without [the victim's] consent before she was able to register her objection. The circumstance that defendant did not apply additional force to continue the intercourse after [the victim] objected does not eliminate his culpability for his initial penetration of [the victim] against her will by use of force." (*Ibid*.)

Similarly, in *People v. Mejia* (2007) 155 Cal.App.4th 86 (*Mejia*), the Court of Appeal held there to be sufficient evidence to support the defendant's forcible rape conviction where the defendant, the 14-year-old victim's grandfather, came into her

8

bedroom without permission while she was in bed, closing the door behind him, "almost immediately jumped on the bed and climbed on top of [her], pulling down her pants and underwear, and unzipping his pants," and then "pulled [her] legs wide apart, pushed her knees back, and painfully penetrated her vagina with his penis. She tried to push him off, but could not." (*Id*. at p. 101.) The court also noted the defendant was "a large man" who had molested the victim in the months leading up to the rape by touching her vagina on top of her clothing, but "she consistently tried to stop him from touching her vagina underneath her clothes." (*Id*. at p. 100.) Analogizing the case to *People v. Griffin*, *supra*, 33 Cal.4th 1015, the court explained: "[T]he onset of defendant's intercourse was sudden and unexpected, giving the victim little opportunity to object. Although the victim— unlike the victim in [*People v.*] *Griffin*—did not offer direct testimony as to her lack of consent, there was ample evidence to support that reasonable inference. The victim had never welcomed or initiated any sexual contact with defendant. More significantly, she actively resisted defendant's repeated attempts to touch her genitalia under her clothes— and, during the rape incident, the victim tried to push defendant away. Under these circumstances, the jury could reasonably infer that defendant overcame the victim's lack of consent by his use of force in pulling down her pants and underwear, and pushing her legs wide apart and pulling her knees up." (*Mejia*, *supra*, 155 Cal.App.4th at p. 102.)

Here, viewing the evidence in the light most favorable to the judgment, we conclude there was sufficient evidence of force to support defendant's forcible rape convictions. The first incident in the bedroom was remarkably similar to the rape in *People v. Griffin*, *supra*, 33 Cal.4th 1015. As in that case, L. testified defendant held her arms down while he penetrated her vagina with his penis, she did not consent, and the act was done against her will. While L. did not testify she told defendant to stop or tried to push him off of her during this incident, neither is required. The second incident in the

9

van involved more force than the first and included elements also present in *Mejia*, *supra*, 155 Cal.App.4th 86, i.e., L. testified she tried to get out from under defendant during the second incident, but was unable to do so due to the large size disparity between defendant (6 feet, 2 inches in height, weighing 275 pounds at the time of his arrest) and his 14-year-old daughter. Moreover, unlike *Mejia*, L. also testified she did not consent to this act of intercourse and it was done against her will.

Nevertheless, defendant argues L.'s testimony was "inherently implausible" because she "crocheted a cloth of conflicting statements" in this case. We disagree. L.'s prior inconsistent statements did not render her testimony regarding defendant's use of force implausible. A reasonable jury could have concluded L.'s delay in disclosing to her mother that defendant had sex with her until the pregnancy was diagnosed, her initial lies to hospital staff and CPS workers about the father's identity, and her incomplete disclosure of rape to the police officer who spoke to her in the backyard, revealed a girl who did not want anyone to know what her father had done to her, but slowly became more comfortable discussing the subject, eventually revealing the full extent of defendant's crimes in the SAFE interview, which corroborated her trial testimony. Nothing in this series of events makes her claim of forcible rape implausible. Nor does the statement L. wrote denying defendant forced her to have sex with him. Viewed in the light most favorable to the judgment, the evidence reasonably supports the conclusion L. overheard T.B. talking to K.G. about writing such a statement and was also informed by K.G., based on her prior conversation with T.B., that "force" in the rape statute required defendant to have held a gun to L.'s head, placed a knife to her throat, or uttered a threat of some kind. Because none of those specific acts occurred, and because she did not want her family to turn on her, L. decided to write the statement recanting her previous claim force was used. In other words, "[h]e did not force me" in the statement simply

10

meant defendant had not used a gun, knife, or threats to accomplish the sexual intercourse. As we have already explained, this degree of force is not required. The same can be said of L.'s oral statements to K.G. and T.B., made around the same time, i.e., "[D]ad didn't force me" and "'[i]t didn't happen that way.'" We acknowledge, of course, L.'s conflicting statements may have given the jury reason to disbelieve her claims of forcible rape, but they did not render those claims inherently implausible such that no reasonable jury would have believed her.

Defendant also points out L. answered in the affirmative when asked during cross-examination whether she was worried CPS would take her baby from her if they believed she willingly had sex with defendant, and whether she thought her family members would turn against her if they believed the same thing. While these concerns arguably gave L. a motive to lie about the intercourse being against her will, they do not render her claim of forcible rape implausible. And, contrary to defendant's argument on appeal, nor does the fact L. had a cell phone in her bedroom the night of the first incident but did not call anybody to report the rape, or the fact she did not move out of defendant's house immediately after the incident in the van, or the fact L.'s testimony she that avoided defendant after the rapes was contradicted by other evidence. Again, while these circumstances may have undermined L.'s credibility, they did not render her testimony implausible.

Finally, defendant's reliance on *People v. Carvalho* (1952) 112 Cal.App.2d 482 and *United States v. Chancey* (11th Cir. 1983) 715 F.2d 543 is misplaced. We decline to provide a detailed explication of these cases. It will suffice to note each involved testimony from the alleged victim that was "fantastic," to "put[] it mildly." (*People v. Carvalho*, *supra*, 112 Cal.App.2d at p. 489.) Not so here.

11

We conclude defendant's forcible rape convictions are supported by substantial evidence.

## II

### *Exclusion of Impeachment Evidence*

Defendant also claims the trial court abused its discretion and violated his constitutional rights by preventing his trial counsel from cross-examining L. about an admitted lie she told the prosecutor to get out of school. Assuming the trial court abused its discretion, the assumed error was harmless under any standard of prejudice.

### A.

### *Additional Background*

During defense counsel's cross-examination of L., counsel asked whether or not she remembered "lying to [the prosecutor] about some officers coming to [her] school." The prosecutor objected on relevance grounds, an unreported sidebar discussion took place, and defense counsel moved on to another topic.

The following day, defense counsel placed the content of the unreported sidebar discussion on the record. He explained his predecessor received an e-mail from the prosecutor in September 2012 that stated: "'[L.] called me around midday on Friday, August 17th, to say that police officers had been at her school to speak with her that morning. [¶] She asked if I knew what it was about. . . . [L.] said it made her nervous so she called her mother who then picked her up from school. [¶] I called Detective Krutz to check if he had been out to the school. He had not but said he would look into it. He called me later in the afternoon to relay that he [had] just spoken to [L.] who apologized and admitted making it up because she wanted to leave school.'" The prosecutor also forwarded a follow-up e-mail from the detective that stated: "'I remember calling the principal and speaking with him regarding law enforcement on his campus. He stated

12

that he had no law enforcement on his campus . . . that day regarding [L.], and that he called [L.] and her mother and learned that [L.] was lying to get out of school. I now remember also speaking with [L.] and her mom that day after speaking with the principal. [¶] [L.] apologized for lying. [K.G.] was embarrassed and also apologized.[']" Defense counsel also noted he believed L. "claimed to not have any recollection of that incident" during her preliminary hearing testimony.

Defense counsel argued the relevance of the line of questioning as follows: "I believe it is relevant because it . . . establishes that she is, one, talking about this case, circumstances surrounding the case to this district attorney. And questions have been asked and evidence will be introduced I'm sure from the district attorney about . . . consistent statements by [L.] [¶] And it is also relevant because it is obviously an act [of] dishonesty. It is an act of dishonesty that manipulates the facts of this case to her advantage. In other words, she is using her victim status to gain an advantage, in other words, to get out of school. When she's called on it, she [is] obviously lying, and she admits that she's lying, that she's trying to use that to get out of school. [¶] . . . It is also a potential that the jurors will disbelieve that she does not remember such an event lying to a district attorney and then having the detective on your case call you up, call you out on it and admitting lying to a police officer I think is one, even with a bad memory, might be expected to remember. [¶] And the jurors might find her trial testimony less credible because she claims not to — not to be remembering that. [¶] Also I believe she never got in trouble for that lie. So she never got in trouble for lying to people obviously at the hospital and to CPS. And she certainly didn't get into trouble for lying to the district attorney and admitting that she lied to this detective. And so that is also relevant to her credibility at this trial."

13

The trial court then acknowledged defense counsel had provided the court with a copy of the e-mail from the prosecutor at sidebar and explained it excluded the line of questioning under Evidence Code section 352 because L.'s lie was not connected to the facts of the case. After hearing further argument from defense counsel, specifically, that he was "entitled to introduce specific acts of dishonesty under the Evidence Code to establish that [L.'s] not credible" regardless of whether or not the lie "relates to the case," the trial court adhered to its ruling excluding the evidence.

## B.

### *Analysis*

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "Evidence going to the credibility of a witness is relevant evidence." (*People v. Lavergne* (1971) 4 Cal.3d 735, 742 (*Lavergne*), citing Evid. Code, §§ 406, 780.)

Nevertheless, a trial court may exclude otherwise admissible evidence under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Rulings under this provision "come within the trial court's discretion and will not be overturned absent an abuse of that discretion." (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.) Our Supreme Court has explained: "Section 352 permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption. That section requires that the danger of these evils substantially outweigh the probative value of the evidence. This balance is

14

particularly delicate and critical where what is at stake is a criminal defendant's liberty." (*Lavergne*, *supra*, 4 Cal.3d at p. 744.) Accordingly, "[Evidence Code] section 352 must bow to the due process right of a defendant to a fair trial and his [or her] right to present all relevant evidence of significant probative value to his [or her] defense. [Citations.] Of course, the proffered evidence must have more than slight relevancy to the issues presented. [Citation.]" (*People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 599; *People v. Reeder* (1978) 82 Cal.App.3d 543, 553.)

Here, defense counsel sought to impeach L. with a lie she admittedly told the prosecutor in order to get out of school for the day. Under Evidence Code section 780, subdivision (k), such an "admission of untruthfulness" is generally admissible as it has a tendency to "disprove the truthfulness of [her] testimony" at trial. However, this proposed impeachment concerned a "collateral matter," as the trial court recognized when it noted the lie was not connected to the facts of the case. "While collateral matters are admissible for impeachment purposes, the collateral character of the evidence reduces its probative value and increases the possibility that it may prejudice or confuse the jury." (*Lavergne*, *supra*, 4 Cal.3d at p. 742.)

In *Lavergne*, *supra*, 4 Cal.3d 735, a robbery case, one of the robbers who had already pleaded guilty testified for the prosecution and stated he drove two of the other robbers to the site of the robbery in his car. When, during cross-examination, defense counsel asked if the car was stolen, the witness said it was not. Defense counsel then sought to impeach this witness with evidence the car was in fact stolen. The trial court sustained the prosecution's objection to this evidence under Evidence Code section 352. (*Id.* at pp. 739-741.) Our Supreme Court affirmed, explaining the admissibility of collateral impeachment evidence is subject "to the trial court's 'substantial discretion' under [Evidence Code] section 352 to exclude prejudicial and time-consuming evidence."

15

(*Id*. at p. 742.) The court first cited an earlier case in which it held the trial court had discretion to exclude "attempted impeachment of a prosecution witness on a collateral matter involving a crime with which the witness was neither charged nor convicted." (*Id*. at p. 743.) The court also explained a witness may possess a "strong reason" to lie about having committed such a crime, but "no motive to lie in his [or her] other testimony," and therefore the connection between the specific lie and the truthfulness of the remaining testimony is "weakened." (*Ibid*.) The court further noted the witness denied having stolen the car and explained that "[a] party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be contradicted." (*Id*. at pp. 743-744.) Characterizing the proposed impeachment evidence as having "slight" probative value compared to the "substantial" danger of "prejudice and confusion," the court concluded the trial court's decision to exclude the evidence was not an abuse of discretion and did not violate the defendant's due process rights. (*Id*. at p. 744.)

We view the lie L. told to get out of school for the day as having less probative value than the witness's lie in *Lavergne, supra,* 4 Cal.3d 735 regarding the car being stolen. Children regularly lie to get out of school. While any lie has at least slight relevancy with respect to whether a witness is testifying truthfully, we conclude this particular lie had no more than that. However, the danger of prejudice was also minimal given the innocuous nature of the lie. Additionally, unlike *Lavergne*, where the defense attorney elicited a denial from the witness during cross-examination and the trial court prevented the admission of additional evidence proving the car was stolen, here, we do not know whether L. would have admitted to the prior lie. If so, no additional evidence would have been required and no additional time would have been consumed. If not, the

16

additional evidence would not have consumed much time.[2] Nor do we believe allowing this line of questioning would have caused the jury to confuse the issues. However, given the minimal probative value of the prior lie, we need not determine whether the trial court abused its discretion in determining this probative value was substantially outweighed by the statutory counterweights set forth in Evidence Code section 352. Assuming such an abuse of discretion occurred, it was manifestly harmless for the very reason the probative value was minimal. This lie was also cumulative of other evidence far more probative of L.'s credibility, such as the recantation letter.

## III

### *Prosecutorial Misconduct*

Defendant further asserts the prosecutor committed prejudicial misconduct and violated his federal constitutional rights by, among other things, arguing to the jury that "defense counsel must produce 'credible' consent evidence to refute [the] forcible rape charges" that defendant argues constituted improper burden shifting and *Griffin* error (*Griffin, supra,* 380 U.S. 609). As explained below, we conclude the prosecutor did not commit prejudicial misconduct.

### A.

### *Additional Background*

During the prosecutor's closing argument, after explaining to the jury it could convict defendant of forcible rape based solely on L.'s testimony, the prosecutor invited the jury to consider her demeanor while testifying and her prior consistent statements.

---

[2]  Although then the additional rule noted by the court in *Lavergne*, i.e., a party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be contradicted, would be implicated. However, because L. was not allowed to answer the question, we do not know whether she would have denied the prior lie.

17

With respect to L.'s trial testimony and statements she previously made to the police officer who spoke to her in the backyard, to the SAFE interviewer, and while testifying at the preliminary hearing, the prosecutor argued she "described forcible conduct, rape," and "*there is no credible evidence of consensual sex*." (Italics added.)

The prosecutor then argued L.'s initial lies about the identity of her then-unborn child's father did not amount to evidence she had consensual sex with defendant. The prosecutor also argued L.'s written statement defendant did not "force" her to have sex with him, and her oral statement to T.B. that "it wasn't like that," was not credible evidence of consent because K.G. told L. "force" required defendant to have placed a gun to her head or held a knife to her throat, which L. never claimed happened. However, argued the prosecutor, such a show of force was not legally required to qualify as forcible rape. Instead, L.'s description of the sex acts themselves—i.e., defendant holding her arms down in the first incident, and pushing her into the back of the van and holding her down with his body weight in the second incident—qualified the acts as forcible rape. The prosecutor then repeated: "*And there is no evidence to show that she consented* [*in her bedroom*]*, and there is no evidence to show that she consented in the van. I should say there is no credible evidence that that was the case*." (Italics added.)

At the close of the argument, the prosecutor urged the jury, when considering the arguments of defense counsel, to consider whether such arguments are "based on credible evidence." She continued: "Is it evidence, first of all, and is it credible or is it just an insinuation or [is] it just something that they are trying to say. Consider that. [¶] *Whatever the thing he argues, whatever the issue that comes out, does that thing mean it didn't happen? Does it mean she wasn't raped? Does it prove it?* Or instead does it mean that she has made an intentionally false rape allegation[] against her father who [s]he used to consider her best friend. [¶] She's a daddy's girl. Did she go from being a

18

daddy's girl who loved him to making an intentionally false serious rape allegation against him time and time again through testimony, speaking with the police, interviewers. *Is that what that evidence proves, that argument proves?*" (Italics added.)

Defense counsel objected, arguing the foregoing statements "inappropriately plac[ed] the burden on the defendant to prove or provide evidence that certain things -- these charges didn't happen." The prosecutor responded: "I was clear that the burden is always on the People, but in terms of any argument that may be raised, I'm asking them to consider if it is credible and so forth. That's not the same thing as saying, you know, it is not my burden or anything along those lines." The trial court ruled: "I didn't find it to be a burden shift either, but the objection is in the record."

## B.

### *The Prosecutor Did Not Shift the Burden of Proof*

"Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citation.] By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and ' "it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct" ' [citation]." (*People v. Davis* (2009) 46 Cal.4th 539, 612.)

Although a prosecutor has "wide latitude [in closing argument] to discuss and draw inferences from the evidence at trial" (*People v. Dennis* (1998) 17 Cal.4th 468, 522), and "may comment that a defendant has not produced any evidence, he or she may not suggest that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' " (*Young*, *supra*, 34 Cal.4th at pp. 1195-1196, quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1340.) " 'To prevail on a claim of

19

prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' [Citation.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 337.)

In *People v. Hill* (1998) 17 Cal.4th 800 (*Hill*), the prosecutor described reasonable doubt by stating: "'It's not all possible doubt. Actually, very simply, it means, you know, you have to have a reason for this doubt. *There has to be some evidence on which to base a doubt. . . .* There must be *some evidence* from which there is a reason for a doubt. You can't say, well, one of the attorneys said so.'" (*Id*. at p. 831.) Our Supreme Court found the prosecutor's comments to be "somewhat ambiguous," explaining they were proper to the extent she was simply "exhorting the jury to consider the evidence presented, and not attorney argument, before making up its mind," but improper to the extent the comments "could reasonably be interpreted as suggesting to the jury she did not have the burden of proving every element of the crimes charged beyond a reasonable doubt. [Citations.] Further, to the extent [she] was claiming there must be some affirmative evidence demonstrating a reasonable doubt, she was mistaken as to the law, for the jury may simply not be persuaded by the prosecution's evidence." (*Id*. at pp. 831-832.) The court concluded there was a reasonable probability the jury understood the comments to mean the defendant had the burden of producing evidence to demonstrate a reasonable doubt as to his guilt and held the prosecutor committed misconduct. (*Id*. at p. 832.)

By contrast, in *Young*, *supra*, 34 Cal.4th 1149, the prosecutor argued to the jury: "'What fact—what fact other than conjecture and insinuation do you have to say there is a reasonable interpretation of that evidence that leads to the defendant's innocence? What? None. You don't have any. There is none. [¶] 'Think of what set of

20

circumstances that are reasonable that will hold water, that will hold together, that would say to you as a jury the defendant did not kill [the victim]. There is no evidence. The only evidence you have is that the defendant went into that place alone and left alone.'" (*Id*. at p. 1195.) Our Supreme Court held the prosecutor did not cross "the critical line" between commenting on the evidence and suggesting the defendant had a burden of production or proof, explaining, "there is no reasonable likelihood the jurors would have understood the prosecutor's argument as imposing any burden on defendant." (*Id*. at p. 1196; see also *People v. Bradford*, *supra*, 15 Cal.4th at pp. 1339-1340 [brief comments by the prosecutor during closing argument noting the absence of defense evidence contradicting that produced by the prosecution did not impermissibly shift burden to the defendant].)

Here, too, we conclude the critical line was not crossed. Viewed in isolation, the prosecutor's concluding comments could be read to suggest defense counsel was required to rebut the prosecution's case against defendant by proving L. was not raped. But this was not defendant's burden. His only burden was to raise a reasonable doubt, which could be done by pointing to evidence raising such a doubt, or by persuading the jury the prosecution's evidence did not prove the charges. (*Hill*, *supra*, 17 Cal.4th at p. 832.) However, we do not view the prosecutor's statements in isolation. In the context of the entire argument, we conclude this case is closer to *Young, supra,* 34 Cal.4th 1149 than *Hill*. We first note the prosecutor explained to the jury that she had the burden of proving beyond a reasonable doubt that defendant raped L. She also provided a detailed review of the evidence proving the charges, focusing on the critical element of force, and argued extensively the evidence suggesting consent should not be credited. It was in this context the prosecutor said, "there is no credible evidence of consensual sex," and "there is no evidence to show that she consented . . . . I should say there is no credible evidence that

21

that was the case." This was proper comment on the evidence. It was not until the end of the argument, addressing what defense counsel was likely to argue in response to her argument, that the prosecutor urged the jury to consider whether defense counsel's argument proved L. was not raped: "Whatever the thing he argues, whatever the issue that comes out, does that thing mean it didn't happen? Does it mean she wasn't raped? Does it prove it? . . . [¶] . . . Is that what that evidence proves, that argument proves?" While the language used is somewhat troublesome, in context, we conclude there is no reasonable likelihood the jury would have understood it to place a burden on defendant. Instead, the prosecutor was exhorting the jurors not to accept defense counsel's argument as evidence or proof of defendant's innocence and urging them to consider his arguments alongside the evidence presented during trial that proved his guilt beyond a reasonable doubt.

## C.

### *The Prosecutor Did Not Comment on Defendant's Failure to Testify*

While defense counsel objected to the prosecutor's closing argument on the basis of improper burden shifting, he did not do so on the basis of improper comment on defendant's failure to testify, i.e., *Griffin* error.

"'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion―and on the same ground―the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' [Citation.]" (*Hill*, *supra*, 17 Cal.4th at p. 820.) However, "[a] defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile." (*Ibid*.) Such is the case here. The trial court's overruling of defendant's burden-shift objection would have signaled to defense counsel further objection on *Griffin* grounds would also be overruled. (*Griffin, supra,* 380 U.S.

609.)  While not always the case, in the context of this particular closing argument, if the trial court did not believe the prosecutor was calling on the defense to present evidence proving L. consented, then the trial court likely would have also concluded this did not amount to indirect comment on defendant's failure to testify, defendant being the only person other than the victim who would have been able to supply such evidence.  We therefore address the merits of defendant's *Griffin* error claim despite his failure to object on this basis.

In *Griffin*, *supra*, 380 U.S. 609, the United States Supreme Court held "the Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (*Id*. at p. 615.)  Our Supreme Court has elaborated:  "Pursuant to *Griffin,* it is error for a prosecutor to state that certain evidence is uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her own behalf." (*People v. Hughes* (2002) 27 Cal.4th 287, 371.)  It is also error for a prosecutor "to refer to the absence of evidence that only the defendant's testimony could provide.  [Citation.]  But although '"*Griffin* forbids either direct or indirect comment upon the failure of the defendant to take the witness stand,"' the prohibition '"does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or call logical witnesses."'" [Citation.]" (*Id*. at p. 372; see also *People v. Harrison* (2005) 35 Cal.4th 208, 257; *People v. Stewart* (2004) 33 Cal.4th 425, 505–506.)

Here, the prosecutor argued there was no "credible" evidence L. consented to having sex with defendant, arguing the recantation statement was not credible for reasons previously discussed.  As already explained, this amounted to proper comment on the

23

state of the evidence. Obviously, the recantation statement provided evidence of consent that the prosecutor was obliged to undermine. Thus, the prosecutor did not argue the evidence of L.'s lack of consent was uncontradicted or unrefuted in a situation where that evidence could not be contradicted or refuted by anyone other than defendant testifying on his own behalf. Such evidence was plainly contradicted and refuted by L.'s own prior inconsistent statements. Accordingly, there was no *Griffin* error.

## D.

### *Other Assertions of Prosecutorial Misconduct*

Finally, defendant acknowledges his additional assertions of prosecutorial misconduct are arguably forfeited for failure to timely object and request curative instructions. He therefore couches these claims in terms of ineffective assistance of counsel, contending his trial counsel rendered constitutionally deficient assistance by failing to object when the prosecutor "demonized defense counsel for pursuing a consent defense," "improperly asserted that defense counsel actively attempted to mislead jurors," "misstated the record," and "argu[ed] on the basis of facts not in evidence."[3] We conclude all but one of the claims are forfeited and defendant did not receive ineffective assistance of counsel. The claim that is preserved is not supported by the record.

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.]

---

[3] Defendant also argues the prosecutor's misconduct was so "egregious" that its prejudicial effect was "incurable," and therefore, trial counsel should be excused from his failure to object and request curative admonitions. We disagree. As we explain, the challenged conduct was either not misconduct or harmless.

Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid*.) "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."''" (*In re Harris* (1993) 5 Cal.4th 813, 832-833; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.)

Defendant has not carried his burden. He first complains his trial counsel should have objected to the following statements as "demonizing defense counsel" for pursuing a defense that challenged L.'s credibility and improperly characterizing that defense as "an unfair attack or assault" on L. During the prosecutor's closing argument, she stated: "The defendant has to attack [L.] He has to, right? We are down to the third option of rape. You know, he has to say she wanted it. And because she testified otherwise, because she's repeatedly said she didn't want it, it was forced whether using those exact words or however she described it, it was rape. [¶] He has to attack her and say she's a liar in one way or another. I anticipate [defense counsel] will do that." During rebuttal argument, she stated: "Time and time again throughout his closing argument what [defense counsel] was trying to do, I believe, is play on an inherent prejudice with teenagers. I don't mean that you dislike teenagers or the same thing with maybe a racial

25

or sexual orientation, that kind of prejudice.  But prejudging, ideas that you have, rubber-stamping about teenagers.  [¶]  And he did it by saying things like, you know how teenagers are.  They always deny.  First they say it is not my fault or they always tell the big whopper lies.  You know how teenagers are.  They are always emotional or aggressive.  That's totally normal.  You know teenagers."  The prosecutor then argued there was "no evidence that [L.] did any of these things" that defense counsel mentioned in his "you know teenagers" remarks.

Contrary to defendant's argument on appeal, we do not view these comments as "'[c]asting uncalled for aspersions on defense counsel'" or "'portray[ing] him as the villain in the case.'"  (*People v. Sandoval* (1992) 4 Cal.4th 155, 183-184 [misconduct for prosecutor to accuse defense counsel of attempting to mislead the jury and of perpetrating a fraud on the court].)  Viewed in context, the prosecutor's "attack" remark during her closing argument referred to defense counsel's likely challenge to L.'s credibility during his closing argument.  Indeed, defense counsel did challenge L.'s credibility during his closing argument, arguing she lied, just like all teenagers lie.  In response, the prosecutor focused on the evidence in arguing L. did not fit the description defense counsel used to portray teenagers in general.  There was nothing improper about this line of argument.

Similarly, defendant characterizes the following statements as "assert[ing] that defense counsel actively attempted to mislead jurors."  Referring to hypothetical situations involving imaginary doubt, the prosecutor stated:  "[Defense counsel] is too smart for that.  He's not going to bring up some imaginary possible doubt.  He is going to work with what is true but tweak it or [p]ut a spin on it that helps the defendant in terms of asking you to look at something in isolation and arguing that it is something that it is not."  This too was not objectionable.  (See *People v. Medina* (1995) 11 Cal.4th 694, 759 [prosecutor's comment that "'any experienced defense attorney can twist a little, poke a

little, try to draw some speculation, try to get you to buy something'" not objectionable]; *People v. Gionis* (1995) 9 Cal.4th 1196, 1216 [prosecutor's remarks pointing out attorneys are "schooled in the art of persuasion" not objectionable because "they did not improperly imply that defense counsel was lying"]; see also *People v. Cummings* (1993) 4 Cal.4th 1233, 1302, fn. 47 ["argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper"].)

Defendant also complains the prosecutor "misstated the record by disputing defense counsel's assertion that [L.] lied after CPS threatened to remove [her] baby." During defense counsel's closing argument, counsel stated he asked L. during cross-examination whether she thought CPS would take her baby if they thought she willingly had sex with defendant, to which she answered yes, and argued this not only gave her a motive to lie about defendant raping her, but she was "willing to do that," i.e., falsely accuse defendant of rape, knowing CPS "can take kids away." Defense counsel also stated: "Did CPS say they were going to do those things? No. They didn't say they were going to do them, but they said they could do it. They could take her away. They could take her siblings. And most importantly they could take her baby away when it is born." During the prosecution's rebuttal, in response to this line of argument, the prosecutor stated: "[Defense counsel] argued that CPS said they would take her baby or that was the implication. That was not the implication. I don't know what he's referring to. What evidence was there of that?" If anyone misstated the evidence, it was defense counsel. There was no evidence either the CPS worker who spoke to L. "said they could do it," i.e., "take her baby away," or otherwise implied they would do so if they believed L. had consensual sex with defendant. There was evidence L. believed that to be the case, but no evidence the CPS workers said or implied anything of the sort. It was not

27

misconduct to point this out in response to defense counsel's argument. The prosecutor then argued the evidence, as she remembered it, supported the view L. initially lied to the CPS workers about a boy from school being the father, but then told the truth about defendant raping her. This was proper argument. (See *People v. Bemore* (2000) 22 Cal.4th 809, 846 ["prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account"].)

In response to other comments from defense counsel, i.e., that "[K.G.] was negligent for allowing [L.] around [defendant]," the prosecutor asked what was so negligent about allowing L. to be around her biological father, and went on to argue there was no evidence it would be "somehow less negligent or more negligent if it was forced versus consensual," concluding: "[t]hat is an insinuation of counsel." Defense counsel objected to these statements as misstating the evidence, stating: "[t]here was evidence of negligence." The trial court immediately admonished the jury that attorney argument "is not evidence" and the jurors were "the sole judges of the facts of the case based on the evidence." To the extent defendant is arguing on appeal that the prosecutor misstated there being no evidence of negligence on the part of K.G., the argument is preserved for review but not supported by the record. What the prosecutor argued was there was no evidence CPS would view K.G. as being more or less negligent based on whether defendant raped or had consensual sex with his daughter. This is true. And even if it did misstate the evidence, defendant received an appropriate admonition. Moreover, whether K.G. was negligent in allowing L. to be around defendant is irrelevant to the question of whether or not defendant raped his daughter.

Finally, defendant asserts the prosecutor relied on facts not in evidence by "assert[ing] someone else could have used [L.]'s e-mail account to send e-mails to [defendant] in jail" and "respond[ing] to the evidence that [L.] had her cell phone in her

28

bedroom on the night of the alleged bedroom incident, but never called anyone, by asserting that [defendant] could have removed the cell phone." With respect to the e-mails, the prosecutor candidly admitted she had "no explanation for those e-mails," pointed out L. testified she did not remember sending them, and asked the jury to consider whether someone else in the house would have had a "motive to cover for the defendant," suggesting defendant's wife (who moved in with K.G. after defendant went to jail) might have had such a motive and access to L.'s computer. With respect to the cell phone, the prosecutor pointed out L. testified she did not remember where her phone was after the rape occurred, and suggested: "If you had just forcibly raped your 14-year-old daughter and she lived under your roof, might you take her cell phone so she can't call out that night?"

With these statements, the prosecutor walked a fine line between making "fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom" (*People v. Wharton* (1991) 53 Cal.3d 522, 567), and improperly "referr[ing] to facts not in evidence" (*Hill*, *supra*, 17 Cal.4th at p. 827), thereby "rais[ing] the possibility the jury would assume [she] had some undisclosed knowledge" as to who sent the e-mails and where L.'s cell phone was the night of the first rape incident. (*Id*. at p. 829.) Defendant argues the prosecutor's comments fell on the improper side of the line. However, as previously mentioned, in order to prevail, he "'must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' [Citation.]" (*People v. Wilson*, *supra*, 36 Cal.4th at p. 337.) Here, the prosecutor candidly admitted she had no idea who sent the e-mails and did not claim to know for a fact that defendant took L.'s cell phone that night. While closer than defendant's other claims of misconduct, we conclude this one fails as well.

Having concluded the prosecutor's challenged statements did not amount to prosecutorial misconduct, we must also conclude defendant's trial counsel was not ineffective for failing to object.

## DISPOSITION

The judgment is affirmed.

_____/s/_____

HOCH, J.

We concur:

_____/s/_____

ROBIE, Acting P. J.

_____/s/_____

DUARTE, J.