[Crim. No. 4806.   Second Dist., Div. One.   July 31, 1952.]

THE PEOPLE, Respondent, v. ANTHONY T. CARVALHO, Appellant.

Wilbur W. McCray for Appellant.

Edmund G. Brown, Attorney General, and Stanford D. Herlick, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the District Attorney of Los Angeles County defendant was charged with the crime of kidnapping his estranged wife Zelda, while he was armed with an automatic pistol.

Following the entry of a plea of not guilty, trial by jury resulted in a verdict finding defendant guilty as charged in the information and also finding that at the time of the commission of the offense charged he was armed. His motion for a new trial was denied, and he was sentenced to state prison for the term prescribed by law. From the judgment of conviction defendant prosecutes this appeal.

Concerning the factual background surrounding this prosecution, the complaining witness, Zelda Carvalho, testified that she and appellant were married on January 14, 1951. That she separated from him in June of the same year and had filed an action for divorce. At the time of the alleged offense on July 14, 1951, she and her 14-year-old son by a former marriage resided together in the city of Los Angeles. That during the month of June, 1951, defendant had accosted her in her home, threatened her and attempted to

choke her with an electric cord. That because of this assault she was in fear of him.

On July 14, 1951, at about 12:30 or 1 p. m., the complaining witness entered her automobile, which was parked in front of her house, intending to drive to a nearby market, cash a check and then to keep an appointment with a lady friend. After she had driven about three blocks she discovered that defendant had been hiding in the rear of the club coupé when he raised up and started to climb onto the front seat. Defendant directed her to turn to the left, but she continued on her route and parked on a lot adjoining the market. Defendant had nothing in his hands at this time, but the complaining witness, according to her testimony, honked the horn of her car in an attempt to attract the attention of some guards whose armored car was also on the lot. The guards ignored her and thereupon she told defendant that she had an appointment at 2 p. m. He countered with the statement that his coat was at a tailor shop and requested her to drive him there. She stated to him that she had to cash a check in the market, but according to her testimony defendant refused to permit her to get out of the vehicle. This conversation lasted about five minutes and finally Mrs. Carvalho started to drive down Sunset Boulevard, and defendant soon directed her to make a turn on Stoddard Street. The prosecutrix told the defendant that there was no tailor shop on Stoddard Street but he insisted on that route, stating that his coat was hidden in some bushes near a house. At this juncture, the complainant drove into a filling station at Sunset and Silver Lake Boulevards at which time defendant told her that he desired to talk with her. She informed him that she had nothing to say and again reminded him of her appointment. Defendant requested that she drive him home and she stated that she would if he would let her pick up her friend. She turned left on Sunset at Silver Lake and drove to Alvarado Street where she made a right turn. Before they reached Beverly Boulevard, a few blocks distant, defendant told her to pull over to the side of the street because he felt sick. Here they conversed for a while, and the complaining witness asked him if he felt better. At this time, according to her testimony, she noticed that defendant was "squirming," and she asked what he had. He then produced a small automatic pistol which had been secreted under his leg and according to her testimony he said, "I will kill you; I don't care what

happens, I will kill us both.'' Concerning her reaction, the complaining witness testified, ''. . . I was scare too death.'' She thereupon asked defendant what he wanted, to which the latter replied, ''If you don't start any trouble or cause any trouble you will be all right.'' He told her that the gun was an automatic; that if he shot her no one would know it because the weapon was equipped with a silencer; that he had no compunction about killing her because he would also kill himself. He then showed her that the weapon was loaded and pointed it in her direction. Defendant asked her if her son was at home, to which she replied she did not believe he was; thereupon defendant stated he wanted to be sure the boy was not home because if he were defendant would kill him also. Still flourishing the gun, defendant ordered his estranged wife to drive to her home.

Upon arrival at the home of the complaining witness defendant took his wife's jacket, which had been on the seat of the car, and covered his hand and the weapon with it. Again he warned her not to cause any trouble and to proceed into the house. The prosecutrix opened the door and they both entered. They were in the house approximately one hour during which time defendant washed, and ate a meal prepared by the complainant. Finally, defendant asked her again to take him to his room in Huntington Park. She drove the defendant to Huntington Park but testified her action in so doing was involuntary. That her compliance with this demand was accomplished against her will and without her consent; that she made the trip only because of her fear of defendant's actions, statements and his exhibition of the gun.

When they left the prosecutrix' home, according to her testimony, he had the gun in his hand. As they made their exit, the door to the house slammed and locked. The prosecutrix told defendant that she had to get the door open so that her son could get into the house, but he at first suggested it remain locked because her son could get in through the window. Upon her stating that this was not possible, defendant entered the house through a window and unlocked the door. Complainant made no effort to leave the premises while he was doing this.

In the automobile they continued conversation and the complaining witness testified that the defendant said the same thing ''over and over again'' and while he did not threaten her with bodily injury he kept the gun in sight at all times.

When they arrived at the defendant's abode, which was a room in a private residence, the complaining witness testified that she tried to "get him to give me the gun" but while he would not relinquish it to her he did consent to put it in a drawer. At this time defendant asked the complaining witness to consider reconciliation. According to her testimony, he continued his protestations that if they were reconciled he would "get a job," and "promised to be good."

Defendant then took a bath, and following this an act of sexual intercourse took place between them. At the trial the complainant did not remember where the gun was at this time, but believed it was either in the drawer or on the dresser.

Thereafter, they talked about getting something to eat, and left the premises at about 7 p. m. They drove in her car to a service station where she alighted from the vehicle, went into a phone booth and called her son. According to her testimony, her husband had told her not to advise her son that they were together. From here they went to a drive-in where they had supper. The gun was now in the glove compartment. While there were automobiles on each side of them at the drive-in, the complaining witness made no effort to apprise anyone of her claimed predicament, nor did she say anything to the waitress who served them.

When the complaining witness told defendant that she must return home he asked her to stay with him. A conversation ensued in which they discussed going to the home of a woman friend of the defendant, but he stated that she was not at home and told the complaining witness to park at a place off Sunset Boulevard. It was then about 8 o'clock. They remained there until approximately 10:30 p. m. According to the testimony of the complaining witness during this period, defendant removed the gun from the glove compartment, and, while he said nothing of a threatening nature, he toyed with the firearm, pointed it in her direction "playfully," and told her he would not hurt her.

The complaining witness ultimately parted company with defendant at about midnight. She made no complaint to the police until a month later, but she testified her brother did register such a complaint on the day of the occurrence.

Throughout her experiences on that day and evening the complaining witness testified she was afraid of defendant and when she drove him to his home she was also activated by the fear induced by his assault upon her one month previously.

Upon cross-examination of the prosecutrix, she testified:

"Q. Did you make stops for stop lights? A. Yes.

"Q. Was there traffic on the street at that time? A. Yes.

"Q. Did you make any effort at any time during the time we have already covered to notify anyone that you were being kidnapped? A. No.

"Q. During that time you had seen several people, had you not? A. Yes."

With reference to what happened while she and defendant were in his room at Huntington Park, the complaining witness, on cross-examination, further testified:

"Q. During this time, was there any show of affection between you and the defendant while you were in his home? A. Yes.

"Q. During this time did an act of sexual intercourse take place in that room? A. Yes.

"Q. Where was the gun during that time? A. I don't remember.

"Q. Was it still in the drawer? A. It was either in the drawer or on the dresser."

There was further testimony by the complaining witness as follows:

"Q. Well, during the time you were in the bathroom, the defendant got into the bathtub, did he not? A. Yes.

"Q. Isn't it true during that time that there was no force or threats which were holding you in the bathroom? A. No.

"Q. During that time you washed his back, did you not? A. Yes."

Testifying as a witness in his own behalf, defendant stated that he hid himself in the automobile of the complaining witness in order to see her because she did not want him to come to the house for the reason that her son was continually running away from the defendant and going to the home of the former's father. Defendant testified that when his wife first approached the car he called her name and told her he wanted to talk to her. Concerning the occurrences on the day here in question, defendant testified to substantially the same facts as the prosecuting witness except that he denied he exhibited a gun or that he threatened her in any way. He admitted owning a gun similar to that described by the complaining witness and testified that he had owned it for about a week. That he kept the gun at his place of abode and that it was there on the day here in question.

In recounting the various happenings on July 14, defendant testified he felt ill; that at no time did he threaten his wife; that whatever she did was done freely and voluntarily. He further testified that while at his room he laid down on the bed, telling her he "was not feeling well . . . please go home and leave me alone." That his wife thereupon said, "Tony, you are sick and I am going to stay and help you." That they then "made love"; that she urged him to shave, "and you will feel better." That he complied. That the complaining witness, "drew the water for my bath, she went in and told me she would wash my neck, my back and my arms," which she did. That his wife said, "Why don't you dress up and we will go and have something to eat and you will feel better." That he acquiesced, whereupon they proceeded to a drive-in where they remained for over an hour, during which time his wife freely conversed with the waitress.

On cross-examination defendant persisted in his claim that he did not see a weapon at all on the day in question. He recalled a conversation with a police officer but denied that he was questioned about the happenings of July 14, 1951. He denied that he told the officer that at the time he and the complaining witness were in the car together he showed her a gun.

In rebuttal, the prosecution produced a police officer who testified that on August 14, 1951, he had a conversation with defendant; that while conversing with the latter, the officer, "referred to a date a month prior to the date on which I was talking to him." That defendant said, "We were in the car together and I showed her a gun." However, on cross-examination the witness was asked, "Now, on that evening were you questioning him about some other crime that had been committed?" to which the police officer replied, "Yes, I was questioning him regarding some other matters."

As his first ground for reversal, appellant contends that the evidence is totally insufficient to support the verdict. Insofar as applicable to the case at bar, section 207 of the Penal Code reads: "Every person who *forcibly* steals, takes, or arrests any person in this state, and carries him into another country, state, or county, or into another part of the same county . . . is guilty of kidnapping." (Emphasis added.)

If the testimony of the complaining witness is to be believed, no reasonable person could doubt that she was forcibly abducted and transported to various places in the county of Los Angeles against her will and without her consent. But

appellant earnestly urges that her testimony is inherently improbable on its face.

In that regard it must be borne in mind that testimony to bear upon its face the brand of inherent improbability, or which may be said to be unbelievable *per se* must involve a claim that something has been done which it would not seem possible could be done under the circumstances described (*People* v. *Haydon,* 18 Cal.App. 543, 555 [123 P. 1102, 1114]).

Our function is not to determine. the weight of the evidence but to decide whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. As was said by our Supreme Court in *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778], "it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below"; and as further stated in the case just cited (p. 681), "We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict." But, as pointed out in the Newland case, page 681, *supra, "the circumstances"* must *"reasonably"* justify the verdict of the jury.

As we view the cause now engaging our attention the question squarely presented is whether the verdict rendered therein is, "reasonably" justified by the facts and circumstances disclosed by the evidence. In determining that question, while we may not weigh the evidence we must of necessity consider it.

That the testimony of the prosecutrix is fantastic is putting it mildly. We are not unmindful of the announced rule that evidence which discloses circumstances that are unusual cannot always be said to be inherently improbable, but in the instant case, the circumstances testified to by the complainant are more than unusual. They do violence to reason, challenge credulity, and in the light of human experience, emasculate every known propensity and passion of people under the conditions testified to by the prosecutrix. They are totally at variance with the usual and ordinary conduct of one who is the victim of kidnapping. Courts cannot and will not shut their eyes and ears to everyday contemporary happenings.

True, the prosecutrix testified she was in fear of appellant, but if ever there was a case for the application of the trite saying, "Actions speak louder than words," this is one.

Neither during the time the complainant was with appellant nor in the month thereafter did her actions and conduct reflect any fear of him. While she and appellant were at the former's home the latter crawled through a window of the house to unlock a door from the inside so that the son of the complaining witness could get into the house when he returned home. While appellant was inside the house the complaining witness remained outside with every opportunity to enter her automobile, drive away and escape. Instead, she waited for him to come out. According to her testimony, when she arrived at appellant's room in Huntington Park, the gun was not exhibited but was placed on the dresser or in a drawer thereof. She and appellant while there commenced "making love," which was consummated by an act of sexual intercourse between them. While in appellant's room he went down the hall to the bathroom while the prosecutrix remained in the bedroom where the weapon was allegedly reposing on the dresser or in a drawer, and she waited for him to return. Appellant then shaved, removed his clothing and proceeded to take a bath. With all this opportunity to leave she proceeded into the bathroom and washed his back, neck and arms for him. While in a busy drive-in café she made no effort to obtain assistance or to escape. While enroute to dinner she stopped her automobile, alighted therefrom, went into a public telephone booth and called her son. She did not advise her son of her claimed predicament, nor did she telephone the police.

When appellant finally left her, saying he would take a streetcar to his home, she made no complaint to the police. As the district attorney stated during the cross-examination, "She said she talked to the police about a month later; at no time did she say she ever filed a report." Concerning her attitude toward appellant during the month following the escapade of July 14, 1951, the prosecutrix testified as follows:

"Q. Now, had you seen the defendant any time after August 14th until the date that you reported this incident? A. Yes.

"Q. Had he been over to your house? A. Yes.

"Q. Had he been over to eat dinner with you? A. Once.

"Q. Had you met him during that period of time? A. Yes.

"Q. During the period of time I just referred to did you take a pot of stew down to the car and stay with him while he ate it because you knew he liked the stew? A. Yes."

The foregoing recital completely negatives the argument of respondent that, "It is apparent that complaining witness

chose a commendable and tactful approach to the dilemma confronting her, for clearly, if she could mollify the appellant and eventually return to her home safely, she possibly could avoid a recurrence. If, however, she attempted to escape, it was foreseeable that appellant, in his then present frame of mind, would intercept her, either before she got away, or would follow her to her house where even more drastic measures might have been attempted, with the added danger that her son might also be present there.''

The foregoing circumstances do not in our opinion reasonably justify the conclusion reached in the court below that the prosecutrix was transported by the use of force and held in captivity through fear on her part.

The corroborative evidence of the police officer, offered by the prosecution in rebuttal that appellant had stated to the witness that, ''We were in the car together and I showed her a gun'' was considerably weakened if not dissipated by the testimony of the officer on cross-examination that on the occasion of the conversation he ''was questioning him (appellant) regarding some other matters.''

Appellant contends it was error to admit over his objection testimony concerning an assault allegedly committed on the prosecutrix about a month prior to the alleged kidnapping. In this regard the record reflects the following testimony given by the complaining witness:

''Q. BY MR. FINNERTY (Deputy District Attorney): Something had happened in the past that had made you afraid of the defendant? A. That is right.

''Q. When was the first time that something happened that caused you to be afraid of the defendant? A. In May, the early part of May; it was in May.

''Q. That was approximately two months before this occasion? A. No, it was later than May, I am sorry. It was probably June. June.

''Q. That was after you had separated from the defendant or before? A. Yes, after.

''Q. After? A. Yes.

''Q. Was it after you filed for your divorce or before you filed for divorce? A. After.

''Q. Where did this happen? A. At my house.

''Q. Who was present at the time it happened? A. Just myself and Mr. Carvalho.

''Q. What time of the day or night did it happen? A. It was morning.

"Q. And this event, then, is only one of the reasons why you were afraid of the defendant when you saw him coming over the seat? A. Yes.

"Q. What happened at that time? A. He put an electric cord around my neck and was choking me."

■ It is a cardinal and universally recognized rule that in a criminal prosecution an accused can be tried only for the offense which is charged against him in the indictment or information, and that evidence of collateral independent crimes is not admissible. The equally well recognized exceptions to this rule are clearly defined. ■ "Evidence of other crimes may be admitted when it tends directly to establish the crime charged by proving a material fact, where it is part of the res gestae, or where it helps to disclose motive, intent, premeditation, guilty knowledge, malice, or a common plan or scheme (20 Am.Jur., § 310 et seq., p. 289 et seq.; 22 C.J.S., § 683 et seq., p. 1089 et seq.; Wigmore on Evidence, vol. II, ch. XIII, p. 191 et seq.; Wharton's Criminal Evidence, § 345 et seq., p. 487 et seq.; 8 Cal.Jur., § 168 et seq., p. 60 et seq.; 13 Cal.Jur., § 84 et seq., p. 703 et seq.)

"The trial court, however, should be guided by the rule that such proof is to be received with 'extreme caution,' and if its connection with the crime charged is not clearly perceived, the doubt is to be resolved in favor of the accused, instead of suffering the minds of the jurors to be prejudiced by an independent fact, carrying with it no proper evidence of the particular guilt. (*People* v. *Lane* (1893), 100 Cal. 379, 387-390 [34 P.2d 856]; 13 Cal.Jur., sec. 84, p. 707; 8 Cal.Jur., sec. 168, p. 61.)" (*People* v. *Albertson,* 23 Cal.2d 550, 576, 577 [145 P.2d 7].)

■ The record reflects that the only purpose of the testimony of the prior offense was to show the state of mind of the prosecutrix. The testimony was manifestly inadmissible. It did not tend directly to establish the crime charged by proving a material fact which was part of the res gestae, because it was remote by some 30 days. Neither did the state of mind of the prosecutrix tend to disclose motive, intent, premeditation, guilty knowledge, malice or a common plan or scheme. The testimony tended only to prove appellant's inclination toward crime, that is, to render more probable his guilt of the charge upon which he was on trial. This is an absolute violation of the rule which permits evidence of other offenses (*People* v. *Albertson, supra,* p. 577). Who can say that the jurors, not possessing that trained and disciplined

mind which enables them either closely or judicially to discriminate between that which they are permitted to consider and that which they are not (*People* v. *Albertson, supra,* p. 577), might not have been entirely influenced in arriving at a verdict in this case by the irrelevant and prejudicial matters which came to their knowledge through the reception of the foregoing evidence of an offense against which the accused was not permitted to defend himself, and of which, if fairly tried, he might be able to acquit himself. The challenged testimony did not come within the foregoing recognized exceptions to the general rule that an accused may not be tried for any offense other than that with which he is charged, and the testimony was therefore inadmissible (*People* v. *Albertson, supra,* pp. 576, 577; *People* v. *Argentos,* 156 Cal. 720, 725 [106 P. 65]). That the admission of this testimony was prejudicially erroneous is evident.

The foregoing conclusions at which we have arrived render it unnecessary to discuss or consider appellant's final contention that the court erred in limiting the cross-examination of the complaining witness. However, we are constrained to say that under the facts and circumstances present in this case, appellant's claim is not entirely without merit.

From a consideration of the record in this case we are persuaded that no man's liberty should be taken from him on a charge of kidnapping upon such a flimsy showing as characterized the evidentiary features of this case, aggravated by the error committed in permitting the introduction of evidence concerning another offense to which we have hereinbefore adverted.

For the foregoing reasons, the judgment appealed from is reversed and the cause remanded with directions to the court below to dismiss the information.

Doran, J., and Drapeau, J., concurred.

A petition was a rehearing was denied August 13, 1952, and respondent's petition for a hearing by the Supreme Court was denied August 28, 1952. Schauer, J., was of the opinion that the petition should be granted.