Filed 5/11/16  P. v. Osborne CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C078208 |
| Plaintiff and Respondent, | (Super. Ct. No. 62115315) |
| v. | |
| JOAL OSBORNE, | |
| Defendant and Appellant. | |

Defendant Joal Osborne was convicted of multiple domestic violence charges, including corporal injury resulting in a traumatic condition to Dusty L., his cohabitant and the mother of his children.  (Pen. Code, § 273.5, subd. (a); unless otherwise set forth, statutory references that follow are to the Penal Code.)  Although Dusty testified at trial that she broke her arm when she fell, Dusty told the police that defendant broke her arm when she defensively raised her arms to stop defendant from striking her in the face.

1

Defendant contends Dusty's story to the police officer was improbable, and therefore there was insufficient credible evidence to sustain his conviction.

We note the record shows the court imposed and stayed execution of a nine-year-eight-month prison sentence, but the clerk's minutes and probation order improperly state the total sentence as nine years six months. We shall modify the probation order, direct correction of the clerk's minutes, and affirm the judgment as modified.

FACTS AND PROCEEDINGS

Dusty and defendant were in a relationship for about seven years, and they have two young children together. In 2012, they were having financial difficulties, as Dusty only earned $9.50 per hour, and defendant was unemployed, caring for the children and attending school. They argued regularly about money, and their relationship was rocky. They lived in the same house along with defendant's grandparents.

On March 30, 2012, Dusty suffered a broken arm just above the wrist. Dusty had two different explanations for how her arm was broken. She testified at trial and previously told the treating emergency room staff and her mother when they spoke while she was in the emergency room that she fell while feeding her goats. She also told her mother and the police that defendant broke her arm when she defensively raised her arms as he was trying to hit her while they were seated in the car. According to the treating emergency room physician, the injury could have been caused by a fall or by a defensive block of a blow from a fist to the face. The physician also testified Dusty did not mention any domestic violence when he treated her, and he did not suspect domestic violence at the time.

Dusty spoke to the police in June 2012, after her mother called 911 on her behalf, when the two discussed an argument between Dusty and defendant over money and household chores. Defendant said Dusty needed to find a new place to live, and Dusty was worried defendant would prevent her from seeing her children. Dusty was also upset

2

because, during their argument, defendant "pushed [her] with his foot to push [her] back," and his foot made contact with her broken arm. In addition, a few days before, defendant had told her, "I'm going to blow your face off."

Dusty was upset and crying when she described to the police officer the recent arguments and altercations. She said defendant got upset at her, but "[h]e never laid a hand on [her] until a couple of months ago."

Dusty told the officer that defendant had broken her arm, which was still in a brace. Dusty explained defendant was picking her up from work that day, and she was running late. Defendant was upset with her as she got into the car. Dusty apologized, but defendant became angry and backhanded her with his right fist. To defend against being hit in the face, Dusty put up her arms, and defendant's fist hit her left forearm just below the wrist. Dusty's arm began to hurt, and she cried and apologized. Dusty described to the officer how she went to the hospital and told the emergency room physician that she broke her arm when she fell while feeding the goats. Dusty told the officer, "I didn't tell the doctor the truth because I didn't want [defendant] to get mad at me [¶]. . .[¶] I didn't know what would happen if he found out I said something." While speaking with the officer, Dusty was not sure which day she broke her arm, so she looked at a calendar on her desk and said it happened in April 27, 2012, nearly a month after it actually happened.

Dusty also told the officer how defendant threatened to blow her face off, and how defendant tried to kick her in the stomach but instead made contact with her broken arm. She told the officer she was "afraid of what's going to happen now when he gets out of jail. [¶]. . .[¶] He already hit and kicked me. I don't know what's going to happen next." When the officer offered her an emergency protective order, Dusty replied she wanted it.

At trial, Dusty testified that she lied to the officer about how she broke her arm because defendant was telling her she had to leave, and she did not want to lose her kids. She testified at trial that, the day she broke her arm, she argued with defendant over

money and household chores. During the argument, defendant was upset and raised his hand to her, but did not touch her. It was not until later that day that she broke her arm, when defendant was at school. She was putting a milk container on a crate for the goats, and the goats were bucking. The crate slipped out from under her, and she cracked her arm on the crate.

In phone calls made after defendant's arrest that were recorded and played for the jury at trial, Dusty told defendant that she initially told the police officer "about the goats," but the officer didn't believe her. Defendant asked Dusty if the police report saying he broke her arm was true, and she responded, "Well, you got mad at me, Joal. Yes [¶] . . .[¶] Yes." Defendant responded he would be in jail "for a long . . . time" and would lose custody of the kids. Defendant continued, "I mean the evidence is here. Even if you say it didn't happen, it did. [¶] . . .[¶] [T]he best thing I can tell you to do is tell them you . . . lied, dude. . . . Do you feel like that's where you want things? [¶]. . .[¶] [I]t's all my . . . fault, dude. But, do you think I deserve it?" Dusty replied, "No, I really don't want you to be in trouble at all. I don't wanna see you have to go through this."

At trial, evidence about the cycle of violence in abusive relationships was presented to the jury by Dr. Linda Barnard, an expert on intimate partner battering. Dr. Barnard explained victims will often make excuses, minimize, and deny the abuse. In addition, it is common for victims to be reluctant or avoid reporting abuse to law enforcement and health care workers. Dr. Barnard also explained victims are often reluctant to testify against their abusers, and they will often recant and tell a different story at trial. This is because victims want to protect the abuser and avoid getting the abuser into trouble.

Defendant was convicted by jury of corporal injury resulting in a traumatic condition to his cohabitant and the mother of his children, with an enhancement for great bodily injury (count one, §§ 273.5, subd. (a), 12022.7, subd. (e)), criminal threats (count two, § 422), cruelty to child by abuse, neglect, or endangering health (count three,

4

§ 273a, subd. (b)), battery (count four, § 243, subd. (e)(1)), dissuading a witness from prosecuting a crime (count five, § 136.1, subd. (b)(2)), disobeying domestic relations court order (counts six, seven, and eight, § 273.6, subd. (a)), and domestic violence contempt of court (count nine, 166, subd. (c)(1)(A)).

Defendant was sentenced to an aggregate term of nine years eight months: the midterm of three years for count one, plus the midterm of four years for the enhancement to count one, one-third the midterm (eight months) for count two, and two years for count five. The court also imposed six concurrent 90-day terms for counts three, four, six, seven, eight, and nine. Execution of the sentence was suspended and defendant was placed on five years' probation.

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant contends the story Dusty told the police about defendant breaking her arm is inherently improbable. According to defendant, the evidence at trial showed breaking a bone requires a lot of force, and it was not credible that defendant could have generated sufficient force while sitting in a car and attempting to strike Dusty's face with his fist. Therefore, he contends, there is insufficient credible evidence to sustain his conviction for count one.

When reviewing a challenge to the sufficiency of the evidence to support a conviction, " 'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence--that is, evidence that is reasonable, credible, and of solid value--from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Maciel* (2013) 57 Cal.4th 482, 514-515.) "We presume ' "in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citation.]" (*People v.*

5

*Gonzales and Soliz* (2011) 52 Cal.4th 254, 294.) We do not weigh the evidence or make credibility decisions. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

Defendant bases his challenge to the sufficiency of the evidence supporting his conviction primarily on *People v. Carvalho* (1952) 112 Cal.App.2d 482 (*Carvalho*), where the court reversed the appellant's conviction for kidnapping his estranged wife at gunpoint. (*Id.* at p. 493.) Although the wife in *Carvalho* testified she was afraid of appellant, she never attempted to escape, despite multiple opportunities to do so. (*Id.* at pp. 489-490.) She "ma[de] love" with appellant and bathed him during the alleged kidnapping. (*Id.* at p. 490.) She also had appellant over to her house and cooked his favorite meal for him after the alleged kidnapping, and she failed to report the crime to police until a month later. (*Ibid.*) The court concluded the wife testified to "fantastic" and "more than unusual" circumstances that "do violence to reason, challenge credulity, and in the light of human experience, emasculate every known propensity and passion" of kidnapping victims. (*Id.* at p. 489; see also *People v. Thompson* (2010) 49 Cal.4th 79, 124 [a reviewing court may reject testimony describing events that are physically impossible or whose falsity is "apparent without resorting to inferences or deductions"].)

Unlike *Carvalho*, the evidence that Dusty's arm broke when she defensively raised her arm to block defendant's blow while they were seated in the car hardly "challenge[s] credulity." (*Carvalho, supra*, 112 Cal.App.2d at p. 489.) Even though Dusty's physician did not suspect domestic violence when he treated her, he testified that her injury "could be consistent" with such a defensive block. Moreover, he testified that it is possible for someone of defendant's height and weight to inflict enough force to break the arm of a woman Dusty's height and weight, even if the two were sitting in a car and he only struck her with his bare hand. As such, Dusty's explanation to the police was not physically impossible.

Defendant also suggests Dusty's story was unbelievable because Dusty failed to report the incident immediately or even call the police herself, confused the date of the

6

injury when talking to the police, and failed to suggest to her treating physician that she was being abused. Such behavior is common in domestic violence victims, according to the expert evidence presented to the jury. Like many abuse victims, Dusty wanted to protect her abuser and avoided testifying against him or reporting abuse to police or mandated reporters like health care workers.

This conclusion is supported by Dusty's statement in the recorded jailhouse calls played for the jury that, "I really don't want you to be in trouble at all," when defendant asked whether he deserved to be in jail or lose custody of his kids. Indeed, defendant even encouraged Dusty to change her story to protect him, telling Dusty, "the best thing I can tell you to do is tell them you . . . lied" to the police about defendant breaking her arm.

On this record substantial evidence supports the conviction. Therefore, defendant's challenge to the sufficiency of the evidence supporting the conviction fails.

II

*The Sentence*

The People contend the clerk's minutes and probation order erroneously stated a "total prison sentence" of nine years six months. According to the transcript, the actual aggregate sentence imposed by the trial court was nine years eight months. Rendition of the judgment is normally an oral pronouncement, and the clerk's minutes and the probation order must accurately reflect what occurred at the hearing. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 388-389.) The total prison sentence of nine years six months must be stricken and replaced with nine years eight months.

DISPOSITION

The probation order is modified to strike the prison sentence of nine years six months and replace it with nine years eight months. As modified, the judgment is affirmed.

7

The trial court is directed to prepare amended minutes of the December 17, 2014, sentencing hearing to reflect the nine-year-eight-month total prison sentence actually imposed.

      HULL      , J.

We concur:

      RAYE      , P. J.

      MURRAY      , J.