Filed 7/23/25  P. v. Edmond CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B333724 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA150158) |
| v. | |
| MICHAEL EDMOND, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kelvin D. Filer, Judge.  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Lauren N. Guber, Deputy Attorney General, for Plaintiff and Respondent.

_____

Michael Edmond appeals from a judgment of conviction after a jury found him guilty of three counts of committing a lewd act on a child under the age of 14 years. On appeal, Edmond contends the court abused its discretion in admitting photographs of two of the victims' genitals and erred by failing to instruct the jury on expert testimony regarding Child Sexual Abuse Accommodation Syndrome (CSAAS). Edmond also argues there was not substantial evidence to support the convictions. Finally, Edmond asserts the court incorrectly calculated his custody credits. We modify the sentence to reflect the appropriate number of custody credits and affirm the judgment as modified.

### FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Evidence at Trial*

In 2019 Michael Edmond was the coach for several youth sports teams and was the deejay at events in the local park. Many children in the neighborhood spent time at Edmond's home that summer playing and swimming. Edmond would help them with math and reading and take them to cheerleading practice and football games. It was common for 10 to 13 children to be at Edmond's house each day. Many of the children spent the night at Edmond's house, some for a few nights a week, others for weeks at a time. Typically the boys slept in the living room, and the girls slept in the den. Edmond slept in a chair in the den with the girls. Edmond's brother and sister also lived in the home in 2019.

Three of the children who spent significant time in Edmond's home during the summer of 2019 were Asyah H.,

Arianna G., and Sanai L.[1]  In August or September 2019, Sanai and Asyah told Sanai's mother that Edmond had acted inappropriately with some of the girls.  Sanai's mother informed the other parents and filed a police report.  Edmond was arrested on September 21, 2019.

Asyah was nine years old in the summer of 2019 and 12 years old at the time of trial.  She testified she spent a lot of time at Edmond's house during the summer of 2019 and slept there three or four nights per week.  Asyah described several incidents in which Edmond touched her inappropriately or made her feel uncomfortable.  On one occasion she was asleep in the den and awoke to someone "touching [her] butt."  She did not see who it was.  At one point Edmond showed Asyah pictures of women's "butt[s]" and "boobs," which made her feel "weird."

Another time Asyah asked Edmond to put lotion on her back.  She stated, "[H]e was putting his fingers lower than where my back was. . . .  He had the lotion on his hand, and then he was putting his finger in my private area."  She clarified that by "private area" she meant "like my butt part. . . .  Like where the hole is."  Asyah said the area started burning and she started to cry.  She went into the bathroom and took a shower.

Asyah also recounted a time she was lying on the couch in the den watching television while Arianna and Sanai were in a blanket fort they had built in the den.  The side of the fort facing the couch was open so the girls could get in and out.  While Asyah was watching television, she felt Edmond lie down on top of her,

---

[1]     There were two additional alleged victims in this case, Octavia H. and Kaila C.  Because the jury acquitted Edmond on all charges relating to Octavia and Kaila, we do not recount their testimony.

3

and he "started rotating his body like up and down." Asyah recalled, "He was on top of me, and then I felt his private area. And then he just kept on going up and down." She felt uncomfortable and scared.

Arianna was 11 years old in the summer of 2019 and 14 years old at the time of trial. She frequently spent the night at Edmond's home during the summer of 2019. She recalled one incident in the summer of 2019 when she and Octavia were lying naked on the couch, and Edmond "would go on top of one of us, and then he [would] switch to the other one." Initially, Arianna was clothed, but then Edmond took her clothes off. He was not wearing a shirt. Edmond touched the two girls with his hands and was "groping" and "rubbing" their "chests" and "private area." In addition, Edmond's penis "was rubbing against" Arianna's butt. Arianna was in shock and felt surprised. While this was happening, Asyah and Sanai were asleep in the fort.

Arianna recalled another time that summer when she, Asyah, and Sanai were dancing on the couch while Edmond watched them from his chair. He told the girls to take their clothes off and then watched them dance naked. Ariana remembered Edmond had something in his hand, which she thought was a camera. Arianna was nervous and scared. She did not want to be naked on the couch while being recorded.

Sanai was 10 years old in the summer of 2019 and 13 years old at the time of trial. She stayed at Edmond's home most of the summer of 2019, sometimes going home on weekends. Sanai described an incident similar to one described by Arianna when Edmond told Sanai, Asyah, and Arianna to take their clothes off and "have a dance party" while Edmond appeared to film them from his chair. Sanai recalled another time when she was asleep

4

on the couch and woke up to Edmond "touching" her on her "private area" where she "pee[s] from." She felt uncomfortable and upset. On another occasion Sanai remembered falling asleep with her pants and underwear on, but when she woke up her clothes were gone. Another time Sanai was taking a shower when Edmond came into the bathroom and tried to record her. She was "really uncomfortable" and tried to hide herself with the shower curtain.

In the fall of 2019, after Sanai's mother filed a police report, a forensic nurse examined each of the girls, and a forensic or sexual assault examiner interviewed them. The video recordings of the interviews were played for the jury, and the transcripts were provided to the jury. Forensic nurse Malinda Wheeler interviewed Sanai in September 2019. Wheeler testified regarding the procedures for forensic interviews generally, and she stated it is common for children to divulge more information about their abuse as time passes. This is because children may be afraid or ashamed and "they just want to gauge the reaction of a trusted, loving adult in their life, to see, well, what's really going to happen if I tell this little bit. And then they will tell maybe a little bit more the next time. And then maybe a little bit more the next time." Wheeler also explained it was common for children to report that the sexual abuse had occurred while other children were nearby or in the same room.

Forensic nurse examiner and forensic interview specialist Patricia Goclowski interviewed Arianna and conducted a sexual assault examination on Sanai. Goclowski testified regarding her interview methodology. She stated it was common for child sexual assault victims to omit details during their forensic interviews for several reasons. They may have forgotten certain

5

details by the time of the interview, or they may feel like they have already disclosed details and do not need to repeat themselves. Sometimes children are subject to external pressures that make them reluctant to make disclosures.

Forensic interviewer Suzy Flores conducted a forensic interview with Asyah. Flores testified regarding the general methodology of forensic interviews of child sexual abuse victims. She explained children often disclose more details about their abuse as time passes because when they first report abuse, they are often "testing the waters," and "a lot of time it's not the full narrative of whatever their experience was." She further explained it was not common for children to immediately report their abuse because they may have a close relationship with the abuser and/or feel affection toward the abuser. For these reasons, it is common for children to return to the location of their abuse even if they anticipate the abuse will continue.

Sexual assault nurse examiner Jennifer Rivera conducted physical examinations of Asyah and Arianna in November 2019. She testified both girls complained of abdominal pain and constipation. Asyah also complained of genital pain and pain during urination. Arianna complained of rectal pain and bleeding. Rivera stated both girls' examinations were normal and did not confirm or negate sexual abuse.

Los Angeles Police Detective Rose Gaeta led the investigation into the alleged abuse. Detective Gaeta testified that a search warrant was executed at Edmond's residence, and several electronic devices were seized, including a video recorder, cameras, and a cell phone. The officers found nothing relevant to the sexual abuse allegations on the devices. Gaeta interviewed

Edmond on the day of his arrest, and a recording of the interview was played for the jury and admitted into evidence.

In the interview, Edmond denied any sexual abuse. He told Detective Gaeta he had known Arianna, Asyah, and Sanai their entire lives and was close to their families. He said he was like a "God-dad" or "Papa" to them. He stated, "The girls love hanging on me. They love kissing on me. . . . They wanna lay on me and rubbing backs and rubbing on legs, that's about as far as I go. I'm not sexually doing—I don't know where that came from. I'm just surprised." He continued, "We wrestle a lot. She may be lying on top of me, but no open sex." Edmond admitted he had watched pornography and masturbated in the den when he thought the girls were asleep. He also admitted to applying ointment on the upper inner thigh of one of the girls.

Edmond called his sister, Charlotte Island, as a witness.[2] Island testified she never witnessed any inappropriate sexual behavior between Edmond and the girls. But Island did recall an incident in which Sanai was crying late at night in the bathroom. Sanai was wearing only a towel and complained about having bug bites. Island offered Sanai ointment and allergy medication, and Island let Sanai sleep in Island's room.

The defense also called Bradley McAuliff as an expert regarding child and witness suggestibility in forensic interviewing. McAuliff reviewed the five recorded interviews of the children (and other materials) in preparation for his testimony. He opined that suggestibility could be an issue in this case because the alleged abuse occurred three years prior to the trial. During that time, the victims' memories may have faded,

---

[2] Edmond did not testify at trial.

and the girls may have been susceptible to influence from adults or their friends. McAuliff was asked about a hypothetical scenario in which two girls report sexual abuse to a parent and the parent discusses the allegations with other parents, who then question their own children about the allegations. McAuliff opined this situation created a risk of cross-contamination in which one individual's account can merge into another individual's memory of the incident. He stated as to the recorded interviews, "For the most part those interviews were done well. . . . Although I may have done something differently . . . I certainly wouldn't argue that those forensic interviewers are bad—you can't believe anything those children say."

B.    *The Verdict and Sentencing*

The jury found Edmond guilty on three counts of committing a lewd act on a child under age 14, one each as to Asyah, Arianna, and Sanai. (Pen. Code, § 288, subd. (a).)[3] The jury found Edmond not guilty on the remaining counts, including counts relating to Octavia and Kaila and additional counts alleged as to Asyah and Arianna.

Edmond waived his right to a jury trial on two alleged aggravating factors under California Rules of Court, rule 4.421, and the trial court found true that the victims were particularly vulnerable (rule 4.421(a)(3)) and Edmond took advantage of a position of trust or confidence (rule 4.421(a)(11)). In the bifurcated proceeding the court also found true the allegation that the offenses were committed against multiple victims (§ 667.61, subds. (b) & (e)(4)).

---

[3]    Further undesignated statutory references are to the Penal Code.

8

The trial court sentenced Edmond to a state prison term of 15 years to life on one count of committing a lewd act on a child and imposed a concurrent term of 15 years to life on each of the remaining two counts.

## DISCUSSION

A.     *The Trial Court Did Not Commit Prejudicial Error in Admitting Photographs of Asyah's and Arianna's Genitalia*
       1.     *Proceedings below*

Prior to trial the prosecution notified the trial court that it intended to introduce into evidence two photographs of Asyah's and Arianna's genitals that were taken during their forensic examinations in 2019. The photographs depict the girls' vaginas and anuses. The prosecutor stated the photographs were relevant to "capture the appropriate age [and] physical stature at the time when the crime was reported." The prosecutor continued, "I have to prove to the jury that penetration occurred. . . . [T]he jury needs to know the anatomical—how would I say? The vagina of an adult is much more developed as opposed to the vagina of a child who is under 10 years old." Defense counsel objected that the photographs were more prejudicial than probative. The court deferred ruling on the admissibility of the photographs until trial.

The prosecution sought to introduce the photographs during trial, arguing the photographs corroborated Asyah's testimony that Edmond forced the girls to remove their clothes and dance naked for him and that Edmond rubbed lotion on her anus. Defense counsel argued the photographs had no probative value, were inflammatory, and were being admitted only to elicit sympathy from the jury.

9

After reviewing the photographs, the trial court ruled the prosecution could admit one photograph each of Asyah and Arianna. The court rejected the prosecutor's argument that the photographs corroborated testimony about the girls dancing naked. However, the court stated, "I'm not suggesting evidentiary value for either side, because the evidentiary value cuts both ways as I see it. . . . [T]here is some evidentiary value given the photos that show whether there was or was not pubic hair, the amount of pubic hair, and also the anatomy of the girls' bodies. . . . And I don't think it's too prejudicial. . . . [O]ur jurors are adults, and I don't think they will be swayed by having one photo of that particular area of the young girls."

During her testimony, Rivera identified the photographs as ones she had taken during her physical examinations of Asyah and Arianna. Rivera identified the opening of the vagina, the hymen, and the anus in Asyah's photograph. Neither side asked Rivera questions about the photographs.

Defense counsel renewed her objection to the photographs prior to the admission of exhibits at the close of the prosecution's case. The trial court again overruled the objection, stating, "I do think there is some evidentiary value in supporting the physical appearance of the children and whether that was something that could conceivably encourage, instigate, be a motive actually as well in terms of committing a lewd and lascivious act upon a child. . . ."

During her closing argument, the prosecutor showed the photographs to the jury. In recounting Asyah's testimony that Edmond had applied lotion to her anal area, the prosecutor stated, "And that is the reason why I showed you Asyah's photograph of her genital parts. . . . That is her vagina, and that

10

is her hole."  The prosecutor showed the photograph again later in her argument, pointing out it depicted "very minimal pubic hair.  You can see how small her vagina is."  The prosecutor also showed the photograph of Arianna's genitals, observing it depicted "some pubic hair.  Again, a prepubescent child."

2. *The trial court erred in admitting the photographs, but the error was harmless*

Edmond contends, the Attorney General concedes, and we agree the trial court erred in admitting the photographs of the victim's genitalia.  As the Attorney General succinctly stated, "the photographs do not appear to be relevant to any contested issue in this case," and "there were no physical findings depicted in either of the photos that would tend to prove any element of the charged offenses."  However, admission of the photographs was not prejudicial.

"[T]he application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of [*People v. Watson* (1956) 46 Cal.2d 818]."  (*People v. Marks* (2003) 31 Cal.4th 197, 226-227; accord, *People v. Thomas* (2023) 14 Cal.5th 327, 373-374 [applying *Watson* to alleged error under Evid. Code, § 352 in admitting photographs of victim].)  "'Under the *Watson* standard, the erroneous admission of a photograph warrants reversal of a conviction only if the appellate court concludes that it is reasonably probable the jury would have reached a different result had the photograph been excluded.'"  (*Thomas,* at p. 374.)

Edmond argues admission of the photographs requires reversal because "at least one juror would have had reasonable

11

doubt as to appellant's guilt . . . but for the emotions evoked by the photographs." While the photographs may have evoked an emotional reaction in the jury, the record does not support a finding it was reasonably probable the jury was overcome with emotion that affected the verdicts. Notably, the jury did not find Edmond guilty on all counts relating to Asyah and Arianna despite admission of the photographs. And during deliberations, the jury requested readback of part of Asyah's testimony and submitted a question asking for clarification on the unanimity instruction. This shows the jury was carefully considering the witnesses' versions of events and assessing their credibility, and there is no evidence the jury was overcome by emotion or otherwise improperly influenced by the photographs. It was therefore not reasonably probable Edmond would have obtained a more favorable result had the trial court excluded the photographs. (See *People v. Watson, supra*, 46 Cal.2d at p. 836.)

B.   *The Lack of an Instruction with CALCRIM No. 1193 Does Not Require Reversal*

1.   *CSAAS evidence and the limiting instruction*

"Expert testimony on CSAAS has long been held admissible in California for the limited purposes of dispelling commonly held myths or misconceptions about child sexual abuse and aiding the jury in 'evaluating the credibility of an alleged child victim of sexual abuse.' [Citations.] CSAAS testimony is permitted "'to explain the emotional antecedents of abused children's seemingly self-impeaching behavior,'" such as delayed disclosure of the abuse. [Citations.] An expert's explanation of CSAAS 'is admissible to rehabilitate [a complaining] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or

12

her testimony claiming molestation.'" (*People v. Sedano* (2023) 88 Cal.App.5th 474, 479.)

"However, pursuit of that laudable rehabilitative purpose must not lead the expert to cross over into affirmatively vouching for the truthfulness of a complainant's allegations against the defendant." (*People v. Sedano, supra,* 88 Cal.App.5th at pp. 479-480.) Thus, "[e]xpert testimony about CSAAS 'is inadmissible to prove that a child has been abused because the syndrome was developed not to prove abuse but to assist in understanding and treating abused children. However, . . . such evidence may be admitted to dispel common misconceptions the jury may hold as to how such children react to abuse.'" (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069 (*Mateo*).)

Accordingly, the Judicial Council of California has developed a pattern jury instruction stating, "Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse. [¶] [The] testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her) [or any conduct or crime[s] with which (he/she) was not charged]. [¶] You may consider this evidence only in deciding whether or not [alleged victim's] conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of the alleged victim." (CALCRIM No. 1193.)

2. *Proceedings below*

During a pretrial hearing the prosecutor stated she intended to have an expert testify regarding CSAAS. Defense counsel objected, but requested that, if the trial court allowed the testimony, the jury be given a limiting instruction that the expert's testimony is not evidence that abuse occurred. The court agreed it would instruct the jury with CALCRIM No. 1193 either before or after the expert's testimony.

The prosecution's CSAAS expert was unavailable to testify at trial, and the prosecution instead relied on the testimony of Wheeler and Flores for an explanation of CSAAS. Although neither Wheeler nor Flores mentioned the syndrome by name or opined on the credibility of the alleged victims in this case, they testified regarding common behaviors of child sexual assault victims. During the testimony of both Wheeler and Flores, the trial court instructed the jury with a modified version of CALCRIM No. 332, stating, in part, that the jury must consider the opinions of the expert but is not required to accept them as true or correct and the jury may disregard any opinion it finds unbelievable, unreasonable, or unsupported by the evidence. After the conclusion of evidence, the court held a conference during which it reviewed the proposed instructions with the parties. Defense counsel did not request CALCRIM No. 1193. CALCRIM No. 332 was included in the jury instructions given at the conclusion of the case.

3. *The trial court did not have a sua sponte duty to instruct with CALCRIM No. 1193*

"In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the

14

issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) But as the Court of Appeal explained in *Mateo, supra,* 243 Cal.App.4th at page 1071 with respect to expert testimony on CSAAS, "As a general matter, the Legislature has determined that limiting instructions need not be given sua sponte. 'When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly.'" (Quoting Evid. Code, § 355, italics added.) The *Mateo* court observed that the Supreme Court has consistently applied Evidence Code section 355 with respect to limited purpose evidence, citing *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051-1052, in which the Supreme Court stated there was no sua sponte duty to instruct the jury on the limited use of gang evidence, and *People v. Humphrey* (1996) 13 Cal.4th 1073, 1088, footnote 5, which observed as to evidence of battered women's syndrome, "an additional limiting instruction might also be appropriate on request." (*Mateo*, at p. 1071; see *People v. Collie* (1981) 30 Cal.3d 43, 63 [no sua sponte limiting instruction required for evidence of prior criminal acts].) We review de novo whether a trial court failed to properly instruct the jury on applicable principles of law. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

Notwithstanding the case law and plain language of Evidence Code section 355, Edmond relies on *People v. Housley* (1992) 6 Cal.App.4th 947 (*Housley*) to support his position that the limited purpose instruction for CSAAS must be given regardless of whether the defendant makes a request. In *Housley* the court acknowledged the general principle that a trial court

15

has no sua sponte duty to give a limiting instruction. (*Housley,* at p. 957.) However, the court observed that "[t]he frequency with which defendants recently have challenged the alleged misuse of CSAAS evidence suggests this type of testimony may be unusually susceptible of being misunderstood and misapplied by a jury. . . . [W]here the case boils down to the victim's word against the word of the accused, such evidence could unfairly tip the balance in favor of the prosecution." (*Id.* at p. 958.) The court concluded "that because of the potential for misuse of CSAAS evidence, and the potential for great prejudice to the defendant in the event such evidence is misused, it is appropriate to impose upon the courts a duty to render a sua sponte instruction limiting the use of such evidence." (*Id.* at pp. 958-959.)

The only published case to address this issue since *Housley* is *Mateo, supra,* 243 Cal.App.4th at pages 1073 to 1074. In rejecting the reasoning in *Housley*, the court in *Mateo* observed the holding in *Housley* was "at odds" with the Supreme Court's more recent decision in *Humphrey, supra*, 13 Cal.4th 1073. (*Mateo*, at p. 1073.) As the *Mateo* court explained, "Throughout its opinion in *Humphrey*, the court repeatedly referred to the trial court's duty to give a limiting instruction on the use of battered women's syndrome evidence on request. [Citation.] The majority opinion in *Humphrey* does not require a sua sponte limiting instruction on the use of evidence of battered women's syndrome, it suggests that an instruction would be discretionary on request: 'If the prosecution offers the battered women's syndrome evidence, an additional limiting instruction *might* also be appropriate on request, given the statutory prohibition against use of this evidence "to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." [Citations.]'

16

[Citation.] Battered women's syndrome is analogous to CSAAS. Both syndromes explain that victims' 'seemingly self-impeaching' behaviors–e.g., delayed disclosure, returning to the home–are consistent with their claims of having been beaten, raped, or sexually molested. [Citations.] We can think of no reason why a duty to instruct should be imposed in one situation and not the other." (*Ibid.*) Thus, the *Mateo* court concluded, a limiting instruction regarding CSAAS testimony "need only be given if requested." (*Id.* at p. 1074.)

We agree with the analysis in *Mateo* and conclude the trial court did not have a sua sponte duty to give a limiting instruction regarding the CSAAS testimony.

4. *Edmond has not shown ineffective assistance of counsel*

Edmond argues that, if we find the trial court had no sua sponte duty to instruct the jury with CALCRIM No. 1193, his counsel was ineffective for failing to request the instruction. To prevail on a claim of ineffective assistance of counsel, "defendant must show, among other things, that his 'counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.' [Citation.] In evaluating his claim, we 'defer[] to counsel's reasonable tactical decisions' and presume that 'counsel acted within the wide range of reasonable professional assistance.'" (*People v. Arredondo* (2019) 8 Cal.5th 694, 711; accord, *People v. Salcido* (2008) 44 Cal.4th 93, 172.) "[I]f the record "'sheds no light on why counsel acted or failed to act in the manner challenged,'" we must reject the claim "'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no

17

satisfactory explanation.""" (*People v. Caro* (2019) 7 Cal.5th 463, 488.)

In this case, the record is silent as to why defense counsel did not request the trial court instruct with CALCRIM No. 1193. And counsel may well have had valid tactical reasons for not making the request. As the Court of Appeal reasoned in *Mateo,* in concluding defense counsel might have had a tactical reason for not requesting CALCRIM No. 1193, "As a tactical matter, competent counsel could rationally conclude that it would be counterproductive to request an instruction highlighting expert testimony supporting the victim's credibility. 'A reasonable attorney may have tactically concluded that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide.'" (*Mateo, supra,* 243 Cal.App.4th at p. 1076; accord, *People v. Venegas* (2020) 44 Cal.App.5th 32, 37 ["Experienced trial lawyers may worry limiting instructions can simply underline evidence they would rather not highlight."].)

C.    *Substantial Evidence Supports the Convictions*

"When a defendant challenges the sufficiency of the evidence for a jury finding, we review the entire record in the light most favorable to the judgment of the trial court. We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt." (*People v. Vargas* (2020) 9 Cal.5th 793, 820; accord, *People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*) ["'To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.'"].) ""Conflicts and even testimony [that] is subject to justifiable

18

suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.'"' (*Penunuri*, at p. 142; accord, *People v. Mendez* (2019) 7 Cal.5th 680, 703.) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

'"We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713; accord, *Penunuri, supra*, 5 Cal.5th at p. 142 ['"A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'"].)

Edmond argues the evidence was insufficient to support the findings that he committed the requisite acts with sexual intent. Under section 288, subdivision (a), "a person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony." '"*Any* touching of a child under the age of 14 violates this section, even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the

19

*intent* to arouse or gratify the sexual desires of either the perpetrator or the victim.' [Citation.] By focusing on the defendant's intent to sexually exploit a child rather than on the nature of the defendant's offending act, section 288 'assumes that young victims suffer profound harm whenever they are perceived and used as objects of sexual desire.'" (*People v. Shockley* (2013) 58 Cal.4th 400, 404.) "Conviction under the statute has never depended upon contact with the bare skin or 'private parts' of the defendant or the victim. [Citations.] Stated differently, a lewd or lascivious act can occur through the victim's clothing and can involve 'any part' of the victim's body." (*People v. Martinez* (1995) 11 Cal.4th 434, 444.)

"As the vast majority of courts have long recognized, the only way to determine whether a particular touching is permitted or prohibited is by reference to the actor's intent as inferred from all the circumstances." (*People v. Martinez, supra*, 11 Cal.4th at p. 450.) The jury may properly infer sexual intent based on "the absence of an innocent explanation." (*Id.* at p. 452 ["if the trier of fact is persuaded beyond a reasonable doubt, from all the circumstances, that the touching of a child was sexually motivated, nothing in the language, history, or purpose of section 288 indicates that the touching should escape punishment simply because it might not be considered a means of sexual gratification by members of the mainstream population," italics omitted].)

All three girls testified regarding at least one incident in which Edmond touched their bodies inappropriately. Asyah recounted one incident in which Edmond rubbed lotion on her butt "where the hole is" and another when he repeatedly rotated his body on top of her. Arianna recalled a time that Edmond

20

instructed her to take off her clothes, and he then lay on top of her while groping her chest and "private area." Sanai stated she once woke up to Edmond touching her where she "pees from." Presuming, as we must, that the jury believed the girls' testimony, each of these accounts supports a finding Edmond touched the girls' bodies. Further, it was reasonable for the jury to infer Edmond's sexual intent given the lack of an innocent explanation for these acts. Further, Edmond showed the girls pictures of nude women and had them dance naked for him. Even if an innocent explanation were possible—for example, that Edmond mistakenly rubbed lotion on Asyah's anus—the jury was under no obligation to credit that interpretation. (See *People v. Westerfield*, *supra*, 6 Cal.5th at p. 713; *Penunuri, supra*, 5 Cal.5th at p. 142.)

Edmond also argues the three girls' testimony should be rejected as inherently improbable. He argues that not only were the girls' descriptions of the acts improbable, but also it was improbable the sexual abuse occurred while other girls were sleeping in the same room. Edmond relies on three cases decided more than 70 years ago to support his contention. For example, in *People v. Headlee* (1941) 18 Cal.2d 266 (*Headlee*) the defendant was convicted of three counts of kidnapping for purposes of rape. The Supreme Court reversed the conviction based on the "inherent improbability" of the alleged victim's testimony, observing that the victim conceded she "exerted no physical effort to prevent the alleged assault" and did not attempt to escape when she had an opportunity to do so. (*Id.* at pp. 268, 274.) Further, the court explained the victim "although unmarried . . . had previously engaged in acts of sexual intercourse." (*Id.* at p. 274.) Thus, the court found it "highly

21

improbable" that the victim had not consented "either actively or passively" to sexual intercourse with the defendant. (*Id.* at p. 273-274.) The other cases relied on by Edmond are similarly based on antiquated views and are inapposite. (See *People v. Carvalho* (1952) 112 Cal.App.2d 482, 489-490 (*Carvalho*) [husband's conviction for kidnapping his wife reversed because wife's testimony that she was afraid of husband was "fantastic" and "[did] violence to reason" given wife had multiple opportunities to get help or escape]; *People v. Casillas* (1943) 60 Cal.App.2d 785, 792-794 (*Casillas*) [father's conviction for rape of his teenage daughter reversed where trial court in bench trial found daughter was credible in testifying her father had raped her, but Court of Appeal found daughter's inconsistent testimony created reasonable doubt, noting there was no "corroborative evidence or incriminatory circumstances being shown"].)

As a threshold matter, it was up to the jury to decide whether the testimony of the girls was credible. Further, as to the presence of the other girls during the abuse, the jury heard testimony that it is common for children to report sexual abuse had occurred while other individuals were in the same room or house. Whatever relevance *Headlee*, *Carvalho*, and *Casillas* cases may have in today's legal landscape given the modern understanding of CSAAS and battered women's syndrome, we do not find their reasoning applicable here.[4]

---

[4] Edmond argues he was denied a fair trial because of the cumulative errors involving the admission of evidence and jury instructions. "'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*People v. Abilez* (2007) 41 Cal.4th 472, 523; accord, *People v. Hill* (1998) 17 Cal.4th 800, 844.) As discussed, the only error the trial court made was

D.  *Edmond Is Entitled to Additional Presentence Custody Credits*

Edmond contends, the People concede, and we agree Edmond is entitled to additional presentence actual custody credits and conduct credits.  A defendant may earn presentence conduct credit for performing assigned labor and complying with applicable rules and regulations.  For those defendants convicted of a violent felony, which includes convictions under section 288, subdivision (a) (§ 667.5, subd. (c)(6)), the rate of accumulated conduct credit is limited to 15 percent of the actual days in custody.  (§ 2933.1, subds. (a) & (c).)

Edmond was arrested and placed in custody on September 21, 2019, and he was sentenced on August 31, 2023.  The trial court awarded Edmond 1,074 days of actual custody credits, plus 161 days of conduct credits for a total of 1,235 days of presentence custody credits.  However, the number of days between his arrest on September 21, 2019 and sentencing on August 31, 2023, including both the start and end dates, is 1,441 days.  Edmond was therefore entitled to 1,441 actual days of custody credit plus 216 days of conduct credit calculated at 15 percent of the total actual days (§ 2933.1), for a total of 1,657 days of presentence custody credits.

## DISPOSITION

The judgment of conviction is modified to award Edmond 1,657 days of presentence custody credits.  As modified, the

admission of the victims' photographs, which we found was harmless.  Under these circumstances, there was no cumulative error that prejudiced Edmond.

judgment is affirmed.  The superior court is directed to prepare a corrected abstract of judgment providing a total of 1,657 days of presentence credits (1,441 actual days plus 216 days of conduct credits), and to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


                                        FEUER, J.

We concur:



        MARTINEZ, P. J.



        STONE, J.